**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| David Burnett, and David Nelson as representatives of a class of similarly situated persons, and on behalf of the Western Global Airlines, Inc. Employee Stock Ownership Plan,<br><br>    Plaintiffs,<br><br>  v.<br><br>Prudent Fiduciary Services LLC, Miguel Paredes, James K. Neff, Carmit P. Neff, James K. Neff Revocable Trust dated 11/15/12, Carmit P. Neff Revocable Trust dated 11/15/12, Kelly S. Neff Trust dated 1/1/10, Danielle J. Neff Trust dated 1/1/10, and WGA Trust dated 8/16/13,<br><br>    Defendants. | C.A. No. 22-270-RGA<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br><u>JURY TRIAL DEMANDED</u> |

## NATURE OF THE ACTION

1.     Plaintiffs David Burnett and David Nelson, as individuals and representatives of the Class described herein, and on behalf of the Western Global Airlines, Inc. Employee Stock Ownership Plan (the "Plan" or the "ESOP"), bring this action under the Employee Retirement Income Security Act, 29 U.S.C. § 1001, *et seq.* ("ERISA"), against Defendants Prudent Fiduciary Services LLC and Miguel Paredes (the "Trustee Defendants"); and James K. Neff and Carmit P. Neff, individually and as trustees of the James K. Neff Revocable Trust dated 11/15/12 and Carmit P. Neff Revocable Trust dated 11/15/12 (respectively), and the WGA Trust dated 8/16/13 (jointly), the Kelly S. Neff Trust dated 1/1/10 (joint Trustees thereof), and the Danielle J. Neff Trust dated 1/1/10 (joint Trustees thereof) (collectively, the "Seller Defendants").

2.     Defendants breached their fiduciary duties with respect to the Plan in violation of ERISA, to the detriment of the Plan and its participants and beneficiaries, by causing both the Plan and the company to be saddled with hundreds of millions of dollars of high-interest debt to finance the Plan's purchase of a minority stake in Western Global Airlines at a grossly inflated price.

3.     Western Global Airlines ("Western Global") is a cargo airline that, until October 2020, was privately owned by Defendants James K., Carmit P. Neff and their family members (through certain family trusts of which they are trustees and beneficiaries). In June 2020, the Neffs created the Western Global ESOP for the purpose of buying 37.5% of their private Western Global stock. James Neff appointed Prudent Fiduciary Services LLC and Miguel Paredes as the trustees of the ESOP.

4.     Shortly after the ESOP's creation, Defendants caused it to purchase the 37.5% stake for $510 million (the "ESOP Transaction")—placing a total value on Western Global of more than $1.3 billion.

2

5.     Because the Neffs are both fiduciaries and "parties-in-interest" to the Plan, ERISA bars them from engaging in self-dealing transactions like this one, unless they carry the burden of proving that the ESOP paid no more than fair market value for the shares. The trustees likewise had an obligation to ensure the ESOP did not overpay. As several key indicators make clear, however, the $510 million purchase price far exceeds the fair market value threshold.

6.     Western Global's historical earnings, for example, do not justify even half of the value Defendants placed on the company. Defendants' valuation would indeed require an "earnings multiplier" nearly four times higher than the multiplier applied to the valuations of comparable companies.

7.     To justify the massive purchase price, Defendants apparently relied on just two quarters of Western Global's financial data from 2020—which happened to be the two most profitable quarters in the company's history. Cherry-picking two record-setting quarters is not an appropriate way to value a company, especially when a leading credit-ratings provider described this two-quarter profit surge as "temporary . . . outsized performance."

8.     Defendants also appear to have placed significant value on the transfer of 16 planes from the Neffs to the company as part of the transaction. But even crediting *the company's own valuation* of the planes gets Western Global only about half way to the $1.36 billion total value ascribed by Defendants.

9.     The transaction's financing only darkens the picture. To buy the shares, the ESOP borrowed the entire purchase price from Western Global. The company, in turn, lacked sufficient money to *lend* the ESOP the full $510 million it needed. To raise those funds, Western Global issued approximately $400 million in junk bonds at an interest rate exceeding 10%. In an era of unprecedentedly low interest rates, a company truly worth $1.36 billion would have been able to

3

issue bonds at a substantially lower rate. And in fact, Western Global's publicly traded competitors were able to do just that. These competitors had a market capitalization around the value ascribed by Defendants to Western Global, and they were able to issue hundreds of millions of dollars in bonds at rates as low as 1.25%. Western Global's need to offer a rate nearly ten times higher signals the market's dim view of the company and severely undermines Defendants' valuation.

10.     The company's massive new debt, moreover, will cost nearly $40 million per year to service, virtually the entire $46 million in earnings that Western Global averaged over the previous five years. It is unclear whether Western Global can even survive such an enormous debt burden. Yet Defendants did not even factor this new debt into their valuation of the company.

11.     In short, the ESOP drastically overpaid for the stock it purchased from the Neffs, causing the ESOP's participants to suffer monetary losses in their retirement accounts and tying their retirement futures to a company whose outlook is grim at best. The Neffs, meanwhile, walked away with more than half a billion dollars, rewarding the Trustee Defendants in the process with fees and valuable protections for helping them fleece the ESOP.

12.     Plaintiffs bring this action to remedy this unlawful conduct, recover losses to the Plan, disgorge ill-gotten gains, and obtain other appropriate relief as provided by ERISA.

## JURISDICTION AND VENUE

13.     Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a)(2) and (3).

14.     This case presents a federal question under ERISA, and therefore this Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

15.     This Court has personal jurisdiction over Defendants because they transact business in and have significant contacts with this District, and because 29 U.S.C. § 1132(e)(2) provides for nationwide service of process.

4

16.     Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) because breaches of fiduciary duties giving rise to this action occurred in this district, and the Defendants may be found in this district. Venue is also proper in this district because the plan document contains a forum selection clause requiring an action to be filed in this district.

## RELEVANT PARTIES

### A.  THE COMPANY

17.     James K. Neff and Carmit P. Neff, husband and wife, founded Western Global Airlines LLC in Estero, Florida in 2013. The U.S. Department of Transportation granted Western Global permission to operate as an air carrier in 2014.

18.     Western Global is in the "ACMI" segment of the air cargo business, which refers to "wet leasing" arrangements in which the lessor provides aircraft, crew, maintenance, and insurance for purposes of transporting cargo of the lessee.

19.     The Neffs, as trustees and beneficiaries of the James K. Neff Revocable Trust dated 11/15/12, the Carmit P. Neff Revocable Trust dated 11/15/12, the Kelly S. Neff Trust dated 1/1/10, the Danielle J. Neff Trust dated 1/1/10, and the WGA Trust dated 8/16/13, were the sole owners of Western Global during its first six years of operations. On October 23, 2020, the Neffs closed the ESOP Transaction, transferring a 37.5% minority interest in the company to the Plan. The Neffs, through their trusts, continue to control a majority 62.5% interest.[1]

---

[1] In conjunction with the closing of the ESOP Transaction, the company converted from an LLC to a corporation, Western Global Airlines Inc. ("WGA Inc."). In 2021, the company changed its structure again, and the company's stock was transferred to a newly created holding company, Western Global Airlines Holdings Inc. ("WGAH Inc."). Shareholders of the company—the Neffs, through their trusts, and the Plan—thus exchanged their shares of WGA Inc. for shares of WGAH Inc. Unless noted otherwise, references to "Western Global" or "the company" refer to the operative entity or stock issuer, as context requires.

20.     The Neffs also control the company's board. The Neffs were the company's only two board members prior to the ESOP Transaction, and the Neffs remained the company's sole board members for approximately one year after the ESOP Transaction. The Plan does not have representation on the board.

21.     The company is the Plan Administrator and a Named Fiduciary of the ESOP within the meaning of 29 U.S.C. § 1102(a).

22.     Prior to the ESOP Transaction, the company did not own its aircraft. The Neffs controlled, and owned indirectly, the planes operated by Western Global, and Western Global leased those aircraft from the Neffs. Between 2018 and 2020, Western Global made between $20 million and $22 million in annual lease payments for the ultimate benefit of the Neffs. The company was also responsible for maintenance and repairs on the planes. In connection with the ESOP Transaction, the Neffs claim to have transferred ultimate beneficial ownership of their fleet of more than a dozen planes to the company. However, the Neffs did not transfer all of their planes to the company, and the company continues to make lease payments in exchange for use of at least one Neff-owned Boeing 747.

23.     The Western Global fleet was, and continues to be, outdated compared to planes operated by its competitors. The Western Global fleet consists primarily of MD-11s built prior to 1996. As the company relies on an aged fleet, maintenance is a critical factor in company finances—both historically and in ongoing independent projections. Ratings agency Fitch noted in 2020 that "unexpected downtime across a few planes could drive significant operating volatility, as observed in 2019." *Fitch Assigns Final 'B+' IDR to Western Global Airlines, Inc.*, FITCH RATINGS (Dec. 23, 2020), https://www.fitchratings.com (hereinafter "*Fitch Assigns Final 'B+' IDR*"). Ratings agency Moody's noted that a 7% revenue decline in 2019 and a 23% decline in the

6

first quarter of 2020 was caused by delays of Western Global's contracts "in order to perform maintenance on its aircraft." *Western Global Airlines, Inc. Credit Opinion*, MOODY'S INVESTOR SERVICE (Aug. 18, 2021), https://www.moodys.com/research/Western-Global-Airlines-Inc-Update-to-credit-analysis-highlighting-the--PBC_1292535. Regarding 2021 and beyond, Moody's stated "the age of [Western Global's] aircraft creates uncertainty around the company's ability to sustain this level of profits on a consistent basis." *Id*.

24.     The company depends on a small group of customers at any given time. Western Global's top five customers in the first 4.5 months of 2020, which included Federal Express, Amazon, and the Department of Defense, provided approximately 65% of Western Global's revenue during that time. *See Moody's Assigns First-Time B2 Corporate Family and B3 Long-Term Unsecured Ratings to Western Global Airlines, LLC*, MOODY'S INVESTOR SERVICE (Jul. 29, 2020), https://www.moodys.com/research/Moodys-assigns-first-time-B2-corporate-family-and-B3-long--PR_428760 (hereinafter "*Moody's Assigns First-Time B2*"). Moreover, the company's customer base has not been stable over time. In 2019, a freight forwarder terminated a four-year contract after only a year due to performance issues tied to the condition of company's aircraft.

## B.   THE PLAN

25.     The Plan was established by the company, effective June 6, 2020.

26.     The company is the sponsor of the Plan within the meaning of 29 U.S.C. § 1002(16)(B). According to the Plan's Form 5500 filed in 2021, the company is also the Plan's administrator within the meaning of 29 U.S.C. § 1002(16)(A).

27.     The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and an "employee stock ownership plan" within the meaning of 29 U.S.C. § 1107(d)(6).

28.     The Plan was designed to invest primarily in "qualifying employer securities."

29.     The Plan is established and maintained pursuant to a written document known as the Plan Document (the "ESOP Plan Document"). The assets of the Plan are held in a trust, which is governed by the Western Global, Inc. Employee Stock Ownership Trust Agreement.

30.     On October 23, 2020, the Plan acquired 375,000 shares of the company's stock, representing 37.5% of the 1,000,000 outstanding shares, for $510 million, or $1,360 per share. The $510 million sale price corresponds to a minimum valuation of the company of $1.36 billion.[2] The Plan borrowed 100% of the sale price from the company, and is obligated to repay the company with interest.

31.     In May 2021, the Trustee Defendants determined that, as of December 31, 2020, the Plan's shares were worth $875.17 per share, or $328,188,750, a $188 million reduction in value from the sale price approximately two months prior.

32.     As of December 31, 2020, the Plan had 350 participants with account balances, and total net assets of negative $176,390,760.

## C. PLAINTIFFS

33.     Plaintiff David Burnett resides in Bainbridge Island, Washington. Burnett began working for Western Global as a pilot in 2016, and is currently employed with the company in that capacity. Burnett has been a participant in the Plan since its inception, holds company shares allocated to his individual account in the Plan, and is a vested participant in the ESOP as defined by 29 U.S.C. § 1002(7).

34.     Plaintiff David Nelson resides in LaPort, Indiana. He is a pilot who currently works

---

[2] If the valuation applied lack of control and marketability discounts to the ESOP's 37.5% stake, the implied company valuation would be greater than $1.36 billion.

for Western Global. Nelson has been a participant in the Plan since its inception, holds company shares allocated to his individual account in the Plan, and is a vested participant in the ESOP as defined by 29 U.S.C. § 1002(7).

### D. DEFENDANTS

#### 1. Trustee Defendants

##### a. Prudent Fiduciary Services LLC

35.　　Defendant Prudent Fiduciary Services LLC ("PFS") bills itself as a provider of independent fiduciary, ERISA compliance consulting, and expert witness services related to employee benefit plans such as qualified retirement plans and health and welfare plans. PFS is headquartered in West Covina, California. PFS was appointed a trustee of the Plan by James K. Neff, acting on behalf of the company. As trustee, PFS had the authority to negotiate and approve the ESOP Transaction on behalf of the Plan, including the price the Plan paid for company shares. PFS was also responsible for hiring Marcum, LLP, the accounting firm that created appraisals of Western Global in connection with the ESOP Transaction and the Plan's ongoing regulatory obligations.

##### b. Miguel Paredes

36.　　Defendant Miguel Paredes is the president and founder of PFS and a Plan trustee. Paredes holds title to the ESOP assets as the principal of PFS. In his role, Paredes had authority to negotiate and approve the ESOP Transaction on behalf of the Plan, including the price the Plan paid for company shares. Paredes also had the authority to select and retain Marcum, LLP, the accounting firm that has created appraisals of Western Global in connection with the ESOP Transaction and the Plan's ongoing regulatory obligations.

37.　　At the time of the ESOP Transaction, PFS and Paredes—the "Trustee

Defendants"—were fiduciaries of the Plan within the meaning of 29 U.S.C. § 1002(21)(A) because they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and had discretionary authority or discretionary responsibility in the administration of the Plan. The Trustee Defendants were the trustees of the Plan within the meaning of 29 U.S.C. § 1103(a), and as trustees of the Plan, the Trustee Defendants were named fiduciaries, within the meaning of 29 U.S.C. § 1102(a), pursuant to the terms of the written instruments under which the Plan was established and maintained.

38.     As fiduciaries and as parties providing services to the Plan, the Trustee Defendants were also parties in interest under 29 U.S.C. § 1002(14)(A), (B).

39.     The Trustee Defendants received consideration for their own personal account from Western Global for their services in the ESOP Transaction, in the form of fees and an indemnification agreement.

### 2.     *The Neffs and the Seller  Defendants*

40.     James K. and Carmit P. Neff, the James K. Neff Revocable Trust dated 11/15/12, the Carmit P. Neff Revocable Trust dated 11/15/12, the WGA Trust dated 8/16/13, the Kelly S. Neff Trust dated 1/1/10, and the Danielle J. Neff Trust dated 1/1/10 are collectively referred to as the Seller Defendants.

41.     James K. Neff is the co-founder of Western Global, and has acted as its Chief Executive Officer from 2013 to the present.

42.     Carmit P. "Sunny" Neff is the co-founder of Western Global, has acted as its Chief Innovation Officer from 2013 to the present, and previously served as the company's Chief Financial Officer.

43.     James and Sunny Neff are both members of the company's board of directors.

44.     The ESOP Plan Document named the company as a named fiduciary of the ESOP.

45.     All of the company's actions must be exercised by or under the ultimate direction of the board of directors.

46.     The ESOP Plan Document also granted the board of directors authority to make decisions with respect to the selection, retention or removal of the trustee, and imposed on the board the responsibility to periodically review the performance of the trustee.

47.     The trust document for the ESOP provided that the company has the authority to remove the ESOP's trustee, for any reason, and appoint a successor trustee.

48.     On June 22, 2020, James K. Neff, acting on behalf of the company, appointed PFS and Miguel Paredes as trustees of the ESOP.

49.     In their capacities as officers, board members, and managers of the company,[3] the Neffs were also responsible for orchestrating the sale of a minority stake in Western Global to the Plan. Before the "official" valuation of the company was complete in October 2020,[4] the Neffs, acting on behalf of the company, (1) established the ESOP in June 2020; (2) closed on a $410 million corporate bond issuance at 10.375% in August 2020, for the sole purpose of financing the ESOP Transaction and paying the Seller Defendants (the Neffs via their various trusts) up-front; and (3) closed on an approximately $80 million loan to the company from Truist Financial in

---

[3] Prior to the conversion of the company from an LLC to a corporation in conjunction with the closing of the ESOP Transaction, the Neffs were the managers that exercised ultimate legal and practical control of the company.

[4] In connection with its October 5, 2020 application to the Department of Transportation to modify the company's operating certificate to reflect the anticipated change in corporate form associated with the ESOP Transaction, *see supra* ¶ 4, n.1, the company reported that the valuation of the company had not been finalized as of that date and was still "fluctuating," along with the size of the stake that the Plan would be allowed to acquire.

September 2020, also for the sole purpose of financing the ESOP Transaction and increasing the up-front payment to the Seller Defendants (the Neffs via their various trusts).

50.     By causing the company to borrow approximately $500 million for the exclusive purpose of funding an anticipated transaction that never contemplated more than a 49% stake changing hands, the Neffs committed to a $1 billion minimum valuation of the company before the Trustee Defendants bound the ESOP to enter into the ESOP Transaction.

51.     The Neffs' authority to appoint, remove, and monitor the trustee is recognized as a fiduciary role under ERISA, 29 U.S.C. § 1002(21). The fiduciary authority to appoint or remove other persons acting in a fiduciary capacity carries a concomitant duty to monitor the work of the appointed fiduciaries. *See* 29 C.F.R. § 2509.75-8 (FR-17).

*52.*     Further, as fiduciaries and as directors, officers, and holders of more than 10% beneficial ownership of Western Global, the Neffs were at all times parties in interest to the Plan pursuant to 29 U.S.C. § 1002(14)(A) & (H).

53.     Before the ESOP Transaction, Western Global was 100% owned by five trusts controlled by the Neffs: the James K. Neff Revocable Trust dated 11/15/12, the Carmit P. Neff Revocable Trust dated 11/15/12, the Kelly S. Neff Trust dated 1/1/10, the Danielle J. Neff Trust dated 1/1/10, and the WGA Trust dated 8/16/13.

54.     James K. Neff is the sole trustee of the James K. Neff Revocable Trust dated 11/15/12, and is one of the two joint trustees, with Carmit P. Neff, of the WGA Trust dated 8/16/13. James K. Neff has full control over and access to the assets within each of the trusts. Upon information and belief, James K. Neff is the ultimate beneficiary of the James K. Neff Revocable Trust dated 11/15/12, and an ultimate beneficiary of the WGA Trust dated 8/16/13. These two trusts together, and James K. Neff through his beneficial interest in the trusts, have at all times

held a greater than 10% interest in Western Global, the Plan's employer. These trusts and James K. Neff were therefore, at all times, parties in interest to the Plan pursuant to 29 U.S.C. § 1002(14)(H).

55.     Carmit P. Neff is the sole trustee of the Carmit P. Neff Revocable Trust dated 11/15/12, and is one of the two joint trustees, with James K. Neff, of the WGA Trust dated 8/16/13. Carmit P. Neff has full control over and access to the assets within each of these trusts. Upon information and belief, Carmit P. Neff is the ultimate beneficiary of the Carmit P. Neff Revocable Trust dated 11/15/12. The trust, and Carmit P. Neff through her beneficial interest in the trust, has at all times held a greater than 10% interest in Western Global, the Plan's employer. The trust and Carmit P. Neff were therefore, at all times, parties in interest to the Plan pursuant to 29 U.S.C. § 1002(14)(H).

56.     James K. Neff and Carmit P. Neff's children, Kelly S. Neff and Danielle J. Neff, are the beneficiaries of the Kelly S. Neff Trust dated 1/1/10 and the Danielle J. Neff Trust dated 1/1/10, respectively; on information and belief, James K. Neff and Carmit P. Neff are the trustees of the these trusts, each of whom owned more than a 10% interest in Western Global at/around the time of the ESOP Transaction. The Kelly S. Neff Trust dated 1/1/10 and the Danielle J. Neff Trust dated 1/1/10 were therefore, at all relevant times, parties in interest to the Plan pursuant to 29 U.S.C. § 1002(H). The Neffs are the trustees of the selling trusts, all their knowledge is knowledge imputed to the selling trusts. James K. Neff was also the representative for all Seller Defendants.

57.     On information and belief, upon the closing of the ESOP Transaction, the five trusts, and the Neffs as trustees and beneficiaries of the trusts, received $510 million from the Plan into accounts controlled by the trusts in exchange for a 37.5% stake in the company.

58.     As directors and officers of Western Global, the Seller Defendants had knowledge

of the fiduciary status of the Trustee Defendants and their own fiduciary status.

59.     As directors and/or officers of Western Global, and through their involvement in the ESOP Transaction, the Seller Defendants had knowledge that the ESOP Transaction was for more than adequate consideration given their knowledge of the air cargo industry, their experience running Western Global in the years prior to the ESOP Transaction, and their prior experience with respect to the sale of an air cargo company to a private equity buyer. The Neffs also had knowledge regarding negative valuation factors that do not appear to have been shared with the other Defendants, including that the Neffs had recently purchased at least one plane, a Boeing 747, that the company would be leasing from the Neffs personally after the ESOP Transaction closed, and the extent of ongoing maintenance and safety issues with respect to the fleet that was sold.

**THE PRICE PAID BY THE ESOP WAS GREATER THAN FAIR MARKET VALUE**

60.     ERISA prohibits a fiduciary from engaging in self-dealing transactions: "A fiduciary with respect to a plan shall not . . . in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries[.]" 29 U.S.C. § 1106(b)(2). ERISA also prohibits transactions between a plan and a party-in-interest. *Id.* § 1106(a). Here, the ESOP Transaction constituted one or more prohibited transactions in violation of ERISA and as discussed below.

61.     ERISA creates exceptions to the foregoing prohibitions by permitting such transactions where "the plan receives no less, nor pays no more, than adequate consideration," 29 U.S.C. § 1108(b)(17)(A), and for "the acquisition or sale by a plan of qualifying employer securities . . . if such acquisition [or] sale . . . is for adequate consideration[.]" *Id.* § 1108(e)(1). "Adequate consideration" is defined as "the fair market value of the asset as determined in good

faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with regulations promulgated by the Secretary." *Id*. § 1002(18). "Fair market value" is the "price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." *Brundle ex rel. Constellis Emp. Stock Ownership Plan v. Wilmington Tr. N.A.*, 241 F. Supp. 3d 610, 617-18 (E.D. Va. 2017); *accord Cosgrove v. Circle K Corp.*, 915 F. Supp. 1050, 1064 (D. Ariz. 1995).

62.     Consistent with their fiduciary obligations under ERISA, Defendants together, and the Trustee Defendants in particular, were required to ensure that the ESOP did not pay more than fair market value for WGA stock taking into account all aspects of the Transaction.

63.     The two basic methodologies that are "commonly employ[ed]" by ESOP valuation professionals are the Discounted Cash Flow Method and the Guideline Company Method. The Discounted Cash Flow Method "begins by estimating the company's projected cash flow far enough into the future to arrive at the company's 'terminal growth rate,' or the rate at which it can plausibly be expected to grow indefinitely into the future." *Brundle*, 241 F. Supp. 3d at 618. "That projection is then discounted by a number of factors designed to take into account current cash reserves and liabilities. Because the DCF is calculated by default on a marketable, controlling-interest basis, additional discounts may be necessary to reflect the nature of the shareholder's stake." *Id*. (internal citation omitted).

64.     The Guideline Company Method uses publicly traded companies similar to the subject company to identify a factor by which the subject company's earnings should be multiplied to determine the company's total enterprise value. *See Brundle*, 241 F. Supp. 3d at 618. Under this method, the total enterprise value is then adjusted downward if the company is viewed as riskier

than the comparable public companies, for the lack of control given to the ESOP, or for the lack of marketability for the ESOP shares. *Id.*[5]

65.     Neither the Discounted Cash Flow Method nor the Guideline Company Method can possibly justify the company valuation of at least $1.36 billion used in the Transaction. Nor is there any other basis on which Defendants could have reasonably concluded that the Transaction occurred at fair market value. Moreover, Defendants overlooked many important facts that would have caused them to critically examine the stock appraisal and conclude that the purchase price was much greater than a buyer under no compulsion to buy the stock or suffering from no conflicts of interest would pay.

## A. HISTORICAL EARNINGS DEMONSTRATE THE PLAN PAID MORE THAN FAIR MARKET VALUE FOR ITS 37.5% OF THE COMPANY

66.     One of the most common metrics used to measure a company's earnings for valuation purposes is earnings before interest, taxes, depreciation, and amortization ("EBITDA"). A company's EBITDA is used to compare the value of a business to other similar businesses by looking at trading multiples, or what the value of the company is as a multiple of its annual EBITDA. These multiples can be assessed either by what similar companies are currently worth,

---

[5] As Marcum, LLP—the appraiser hired by the Trustee Defendants—states on its website, "[T]he consideration of discounts for lack of control and lack of marketability are important in any valuation analysis, particularly those involving non-controlling ownership interests in privately-held companies. . . . It is not unusual in the valuation of a non-controlling ownership interest in a privately-held company for the resultant value to be 50%-80% of the value of the company on a controlling, fully-marketable basis." Sean Saari, Partner, Marcum, LLP, *An Explanation of Discounts for Lack of Control and Marketability*, Feb. 18, 2017, https://www.marcumllp.com/insights/an-explanation-of-discounts-for-lack-of-control-and-marketability (last accessed Dec. 14, 2021).

expressed via market cap or enterprise value,[6] or by comparing the company in question to other businesses that have recently been sold or acquired in the same industry.

67.     According to Fitch, two of Western Global's primary peers in the air cargo industry are Atlas Air Worldwide Holdings, which trades as AAWW, and Air Transport Services Group, ticker ATSG. *See Fitch Assigns Final 'B+' IDR* at 3. Analysis of each company's annual reports demonstrate that each company's primary business line is ACMI, as is the case with Western Global.

68.     As of September 30, 2020—the end of the last quarter before the Western Global sale valuation was finalized by Defendants—Atlas Air Worldwide Holdings had an enterprise value of $3.84 billion and five-year average[7] EBITDA of $522 million per year, reflecting that Atlas Air Worldwide Holding was worth 7.4 times its average EBITDA. Air Transport Services Group had an enterprise value of $3 billion and five-year average EBITDA of $338 million, reflecting that Airport Transport Services was worth 8.9 times its average EBITDA.

69.     In comparison, using financial data reported to the Department of Transportation by Western Global, over the five-year period ending September 30, 2020, Western Global's 5-year

---

[6] Enterprise value includes the market cap of a company but also short-term and long-term debt as well as any cash on the company's balance sheet, and is a popular metric used to value a company. *Brundle*, 241 F. Supp. 3d at 618; *Enterprise Value*, INVESTOPEDIA, https://www.investopedia.com /terms/e/enterprisevalue.asp (last visited Dec. 12, 2021).

[7] Assessing five-year historical financial data is standard industry practice in business valuation. *See, e.g.*, Agreement Concerning Fiduciary Engagements and Process Requirements for Employer Stock Transactions at 3, *Perez v. GreatBanc Tr. Co.*, 5:12-cv-01648-R-DTB (C.D. Cal. Jun. 2, 2014) (settlement agreement requiring ESOP sponsor to provide financial statements of the preceding five fiscal years to trustee, and requiring the valuation analysis to consider "[a]t a minimum . . . how the projections compare to, and whether are reasonable in light of, the company's five-year historical averages and/or medians and the five-year historical averages and/or medians of a group of comparable public companies (if any exist) . . . unless five-year data are unavailable[.]"), *available at* https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/enforcement/esop-agreement-appraisal-guidelines.pdf.

historical average EBITDA was around $46 million. Applying the average EBITDA multiple of 8.15 from the Air Atlas and Air Transport analysis would result in total enterprise value of Western Global of only $375 million (*before* discounts are applied). This illustrates why Western Global's revenue cannot justify the $1.36 billion implied valuation (*after* discounts, if any) used in connection with the ESOP transaction.

70.    Based on EBITDA multiples of similar companies in Western Global's line of business, the price the ESOP paid for a 37.5% stake of the company was substantially greater than fair market value because it is based either on wildly inflated EBITDA values or unrealistic EBITDA multiples that no arm's-length buyer would pay.

71.    This valuation can also be adjusted to account for the cessation of lease payments in connection with the transfer of ultimate ownership of more than a dozen planes to the company in connection with the ESOP transaction.[8] Subtracting all lease payments from the company's expenses results in an adjusted 5-year historical average EBITDA of around $65 million. Even then, applying an 8.15 EBITDA multiplier (derived from the EBITDA multipliers of comparable public companies) would result in a total enterprise value (*before* deductions) of only $528 million, which is well short of the implied enterprise value paid by the ESOP of $1.36 billion (*after* deductions, if any).

72.    The ESOP Transaction price corresponds to an EBITDA multiplier of at least 20 times the lease-adjusted 5-year historical average EBITDA of the company, far exceeding the EBITDA multiplier that can be supported by valuations of comparable public companies.[9]

---

[8] This is a favorable assumption to Defendants, as the company continued to make lease payments on at least one plane after the ESOP Transaction.

[9] The market value of the planes themselves does not come close to making up the difference, see *infra* ¶ 101.

73.     Moreover, a price based on an EBITDA multiplier derived from the EBITDA multipliers of comparable public companies would have been well above fair market value, given how much riskier Western Global is as an enterprise compared with Atlas Air and Air Transport Services Group. *See Brundle*, 241 F. Supp. 3d at 618. Among these unique risks are (1) Western Global's more concentrated lines of business, engaging exclusively in the ACMI business line and charter services while Air Atlas and Air Transport also engaged in dry leasing to diversify their revenue stream; (2) the advanced age and relatively poor condition of Western Global's fleet of aircraft, which had historically caused customer service issues and revenue drops, *see supra* ¶ 23; (3) a more concentrated customer base, *see supra* ¶ 24, (4) a much shorter operating history, with Western Global only having been in business for six years at the time of the ESOP transaction, *see Moody's Assigns First-Time B2* at 1 (noting Western Global's "volatile operating history" as one reason for a lower credit rating given that Western Global "has yet to demonstrate consistent operating results") and (5) Western Global's concentrated ownership structure, *see Fitch Assigns Final 'B+' IDR* at 3 ("Fitch considers [Western Global] to be subject to typical risks associated with a highly concentrated ownership structure, such as concentrated decision making and a lack of independent oversight. The founder and CEO (and family) continue to control a majority stake in the business following the [ESOP] transaction."). Aside from the excessive EBITA multiplier, this estimated enterprise value also does not account for appropriate lack of control and marketability discounts that should have been applied.

**B. DEFENDANTS' VALUATION GAVE IMPROPER WEIGHT TO 2020 EARNINGS LEVELS, IGNORING TEMPORARY, CYCLICAL FACTORS RESPONSIBLE FOR A NON-SUSTAINABLE SURGE IN PROFITS**

74.     Given that Western Global's true long-term financial performance did not justify the ESOP Transaction valuation, it appears that Defendants relied on the company's higher earnings in 2020 to support their valuation. More specifically, the outbreak of COVID-19 in March

2020 caused a surge in online shopping, resulting in a large increase in demand for air freight transportation services. Thus, the second and third quarters of 2020—the only two post-pandemic quarters of data the Defendants would have had available—were the two most profitable quarters in Western Global's history, with net profits of $74 million in the second quarter and $37 million in the third quarter, producing more than double the profits that Western Global had earned in its previous most profitable year.[10]

75.     Relying on a mere two quarters of higher profits, and then assuming that they would represent an entirely new level of profitability for the company over the long term future horizon, was flawed. As Fitch Ratings, a leading provider of credit ratings, explained in its analysis of Western Global's August 2020 bond offering: "[Western Global] and other freight-focused airlines are benefitting from the [pandemic-induced] steep drop off in cargo capacity in passenger airlines which has outpaced the decline in demand for shipments. This imbalance, which Fitch assumes will be temporary should support *outsized performance* in 2020[.]" *Fitch Assigns Final 'B+' IDR*, at 1 (emphasis added). This sentiment was shared by Moody's, another leading credit ratings agency, which made note of Western Global's pandemic-fueled windfall resulting from "a significant increase in demand for cargo aircraft as belly space of passenger aircraft declines." *Moody's Assigns First-Time B2*, at 1.

76.     The temporary and cyclical nature of the 2020 surge in profits is best demonstrated by a historical analysis of the two primary factors that play a large role in determining the profitability of air cargo companies, and are almost entirely outside the company's control: the

---

[10] These profits were themselves artificially inflated because the company also received $34 million in one-time federal funds in 2020 to save jobs threatened by the COVID-19 pandemic. Because the pandemic boosted Western Global's business, Congress has asked the company to repay those funds.

freight rate, meaning the price paid to ship goods a certain distance, and the load factor, meaning the average percent of the plane's capacity filled on each flight. Pandemic-induced demand led 2020 to be an all-time high in both the freight rate and the load factor for air cargo transportation. WATS+ World Air Transport Statistics 2021, INTERNATIONAL AIR TRANSPORT ASSOCIATION 1, 6 (2021).[11] Below, in blue, is the average freight rate charged between 2000 and 2020.



Source: IATA, CargoIS, The Airline Analyst

77.     The record-setting freight rates happened to coincide with an all-time high for load factor, or the percentage of an aircraft's cargo carrier capacity that is utilized, as shown by the below graph, showing air cargo load factors between 2000 and 2020.

---

[11] *See* https://www.iata.org/contentassets/a686ff624550453e8bf0c9b3f7f0ab26/wats-2021-mediakit.pdf.



78.     The charts demonstrate that historically, these factors are both cyclical and relatively volatile, and that both reached historical highs in 2020. The highest rates charged per kilogram shipped, combined with the fullest planes in history, equaled the highest profits ever.

79.     Cyclical industry factors such as this must be accounted for in the appraisal process to arrive upon an accurate valuation. *See* 2020-2021 Uniform Standards of Professional Appraisal Practice, THE APPRAISAL FOUNDATION Standard 9, Rule 9-4 ("An appraiser must, when necessary for credible assignment results, analyze the effect on value, if any, of . . . financial and economic conditions affecting the business enterprise or intangible asset, its industry, and the general economy.").

80.     Projecting these historical highs to continue indefinitely into the future, as appears to have been done, was a grave error. Even if the surge in demand for air cargo and the drop in passenger air travel become a permanent feature of the global economy, the profits associated with this type of surge necessarily dwindle as the industry "rebalances," as Fitch determined, through events such as the entry of new competitors, or the capacity of existing competitors expanding as

they purchase planes from commercial passenger airlines who no longer need as many planes. *Fitch Assigns Final 'B+' IDR*, at 1-2. Thus, respected credit analyst Fitch did not overreact to the temporary upswing in profits, projecting in December 2020 a "going forward" annual EBITDA of $65 million per year, which Fitch believed supported an enterprise value for Western Global of only $357 million, roughly one quarter of the valuation applied to the ESOP Transaction.

81.     Had the valuation of Western Global used realistic projections of earnings and EBITDA that had been adjusted to account for the entirely anomalous spikes in demand and profits that occurred in 2020, it would have resulted in a stock price that was substantially less than $1,360 per share.

82.     Specifically, the stock appraisal used by the Trustee Defendants to justify the $1,360 per share value for Western Global stock were based, in part, on the Discounted Cash Flow Method, which was entirely driven by unrealistic and inflated financial projections of Western Global's future cash flows and earnings.

83.     In fact, Jim Neff as the CEO and the Neffs as the only Board members, controlled Western Global's projections of future earnings and EBITDA, which were used to justify the inflated price of $1,360 per share that the ESOP paid. The Neffs, of course, were conflicted because, as owners of the company's stock, they benefited from any inflation in those projections which would increase the price they received for Western Global stock in the ESOP Transaction. The more aggressive their projections were, the more they profited.

84.     In short, the financial projections underlying the Discounted Cash Flow analysis that were used to justify the $1,360 per share price that the ESOP paid for company stock did not accurately reflect Western Global's long term future EBITDA, revenue, and earnings. Discounted Cash Flow analyses are typically based on five to ten years of financial projections and thus the

assumed profitability of the subject company must be realistic over that five to ten year horizon, rather than driven by an unexpected one-year spike in profits and EBITDA (such as that Western Global experienced in 2020). Not surprisingly, EBITDA margins were lower in 2021 than they were in 2020.

## C. THE TRANSACTION FINANCING PROCESS FURTHER DEMONSTRATES THAT THE PRICE THE ESOP PAID WAS GREATER THAN FAIR MARKET VALUE

85.     As described above, the ESOP Transaction was financed primarily by $410 million in corporate bonds issued by Western Global. As reported by Bloomberg, in the last week of July 2020, Western Global first "began sounding out potential investors for the five-year bonds . . . at a yield in the 8.25% to 8.5% range," but in "a sign of tepid demand from potential investors, the range was revised on Tuesday [August 4, 2020] to 8.75% to 9%." Davide Scigliuzzo, *Cargo Airline Cashing in on Junk-Bond Boom for Owner Payout*, Bloomberg (Aug. 5, 2020), https://www.bloomberg.com/news/articles/2020-08-04/cargo-airline-boosted-by-covid-joins-debt-binge-for-owner-payout.

86.     Ultimately, even those 9% yields were not enough to entice investors, and the bonds were issued in August 2020 at a coupon rate of 10.375%, with a 5-year maturity in August 2025.

87.     Having to offer such a high interest rate, especially in the present low-rate environment, demonstrates that the marketplace views Western Global as being in precarious financial position as a result of issuing the debt, which would not be the case if the company were in fact worth $1.36 billion.

88.     Every credit rating agency to opine on Western Global's financial health has classified it as being in the "junk bond" category. And based on the 10.375% coupon rate, the market views the $410 million bond offering as presenting comparable risk to CCC-rated bonds,

which exhibit "substantial credit risk." *Rating Scales*, FITCH RATINGS, https://www.fitchratings.com/products/rating-definitions#ratings-scales (last visited Dec. 12, 2021).

89.     According to the ICE BofA Single-B US High Yield Index Effective Yield, as of August 2020 when the bonds were issued, the average B-rated corporate bond had an effective yield of between 5.5 and 5.8 percent. Federal Reserve Economic Data, *ICE BofA Single-B US High Yield Index Effective Yield*, https://fred.stlouisfed.org/series/BAMLH0A2HYBEY (last accessed Dec. 14, 2021). The 10.375% coupon rate therefore reflected a marketplace view that the debt issuance had roughly a CCC rating, which reflects a view that the company is only 50% likely to repay the bonds.[12]

90.     Issuing $410 million of corporate bonds would not create close to this type of financial insecurity for a company worth $1.36 billion whose only other debt was an $80 million secured loan.

91.     This is perhaps best illustrated by the interest rates that other, publicly traded air cargo companies with valuations similar to the company value assigned in the ESOP Transaction had to pay on corporate bonds that they issued.

---

[12] *See* Federal Reserve Economic Data, *ICE BofA CCC & Lower US High Yield Index Effective Yield*, https://fred.stlouisfed.org/series/BAMLH0A3HYCEY (showing an average effective yield of between 12.2% and 12.5% on bonds rated CCC, CC, C, and D); *Default, Transition, and Recovery: 2020 Annual Global Corp. Default and Rating Transition Study*, S&P GLOBAL RATINGS, https://www.spglobal.com/ratings/en/research/articles/210407-default-transition-and-recovery-2020-annual-global-corporate-default-and-rating-transition-study-11900573 (showing a 5-year default rate of 47.48% on CCC-rated bonds) (last visited Dec. 12, 2021).

92.     As of the end of the first quarter of 2015, Atlas Air had a market capitalization of $1.075 billion.[13] The company then issued $224.5 million of corporate bonds in June 2015 with a 7-year maturity date of June 1, 2024. Despite having a valuation that was $300 million lower than what the ESOP paid for Western Global in August 2020, Atlas was able to issue its bonds at a 2.25% interest rate, more than four times lower than the interest rate Western Global paid.

93.     Two years later, Atlas had a market capitalization as of $1.4 billion as of the end of the first quarter of 2017. Atlas then issued another $289 million of corporate bonds in June 2017 with a 7-year maturity date of June 1, 2024, and was able to do so at a 1.875% interest rate.

94.     Finally, as of the end of the first quarter of 2018, Air Transport had a market capitalization of $1.38 billion. The company then issued $258.8 million of corporate bonds in April 2018 with a 6-year maturity date of October 2024, but were able to issue the bonds at an interest rate of only 1.25%, eight times lower than the interest rate Western Global paid on its bond issuance.

95.     Given the efficiency of markets, it is generally agreed that the prices of publicly traded stocks are an accurate reflection of the company's value. Given the reliability of the valuations of both Atlas Air and Air Transport (as publicly traded companies) in 2015 through 2018, if Western Global was worth $1.36 billion, it would have been able to sell $410 million of bonds at substantially lower interest rate than the company was ultimately forced to pay.

---

[13] For purposes of assessing creditworthiness, market capitalization, which is the marketplace's assessment of a company's value based on the price of its stock, is the relevant measure of value rather than enterprise value, which measures a company's hypothetical value if all of its debt were paid off. Given that Western Global had no debt prior to the ESOP Transaction, the Trustee Defendants' $1.36 billion is comparable to both the enterprise value and market capitalization of a publicly traded company.

96.     All of this information was available to Defendants and their advisors prior to the ESOP Transaction, as the valuation had not been finalized at the time of the August 2020 bond issuance. Had Defendants conducted a thorough and objective investigation of the value of Western Global, they would have significantly revised their valuation of the company downward, in line with the value that the marketplace and credit rating agencies such as Fitch had assessed the company to be worth when the market demanded a 10.375% coupon rate on its debt.

### D.  THE PRICE PAID BY THE ESOP INCORPORATED OTHER ERRORS

97.     As discussed above, once the enterprise value is estimated using the Guideline Company Method and Discounted Cash Flow Method, the enterprise value must be adjusted to address for other valuation issues that were not fully accounted for in the methods relying on EBITDA. However, the $1,360 per share value paid by the ESOP for Western Global stock did not reflect all necessary and appropriate discounts.

#### 1.  *Defendants Overvalued the Fleet*

98.     Defendants have touted the transfer of ultimate ownership of 16 planes from the Neffs to the company as a source of additional value that justified the ESOP Transaction price. In fact, the value of the fleet, when combined with the fair market value of the company, does not come close to supporting the valuation used in connection with the ESOP Transaction.

99.     The company itself, after the ESOP Transaction closed, reported only a $175 million increase in the total value of its operating equipment to the Department of Transportation. Additional equipment worth $175 million would have been insufficient to justify a $1.36 billion valuation based on 5-year average historical EBITDA and reasonable, objective future projections. *See supra* ¶¶ 70-74. Even assuming no historical or ongoing lease payments and no adjustments

for lack of control or marketability (which are counterfactual assumptions in Defendants' favor), the additional equipment could not support a value anywhere near the valuation applied.

100.    Moreover, the fair value of the planes was likely much lower than the $175 million ascribed by Western Global. In connection with the company's subsequent purchase of MD-11s similar to the majority of the planes transferred from the Neffs to the company, an independent valuation professional opined that the planes were worth $5 million to $13 million, depending on condition. The MD-11s subject to the subsequent sale, however, were all manufactured in 1998, and thus were newer than the Neff-transferred MD-11s, which were manufactured between 1990 and 1995. In addition, the Neff-transferred planes had well-documented maintenance issues that had hampered company performance in the past.

101.    Thus, based on the independent valuations used for similar newer planes without maintenance issues, the 16 planes the Neffs transferred to the company were likely worth well below $100 million. Accordingly, the valuation of the fleet of $175 million (based on public records) around the time of the ESOP Transaction was inflated and further contributed to the substantially inflated price the ESOP paid for its 37.5% ownership stake in Western Global, reflecting an wildly overvalued enterprise value of $1.36 billion.

## 2.   *The Price the ESOP Paid Failed to Adequately Reflect the Company's Concentrated Customer Base, Lack of Voting Power and Potential Dilution from Synthetic Equity*

102.    Western Global also has a heavily concentrated customer base, which makes its future profitability and EBITDA uncertain because a small customer base comes with substantial risk that projected profits and EBITDA will not be met, or worse not come close to being met, if one customer reduces its demand for Western Global's air cargo services, which could happen for

a number of reasons. This company-specific risk factor was not adequately reflected in the valuation that was used to justify the $1,360 price per share paid by the ESOP.

103.    In addition, the $1,360 price per share paid by the ESOP did not reflect what a non-conflicted buyer, under no compulsion to buy Western Global stock, would pay for stock that did not have standard shareholder rights, such as the power to vote for the members of the Board of Directors. ESOP Participants were not given the right to vote for Board seats even for the shares allocated to their accounts. Instead, Miguel Paredes, who was paid to be the ESOP Trustee and was selected and removable at will by the Neffs, voted all ESOP owned shares in Board elections. Not surprisingly, the Neffs have never been voted *off* the Western Global Board of Directors.

104.    The ESOP Plan Document also indicates that synthetic equity in Western Global is granted to individuals. Synthetic equity is usually granted to high level executives by the Board of Directors. Here, the Neffs are both high level executives and on the Board.

105.    When synthetic equity is granted, it dilutes the value of ESOP shares held by Plan participants and transfers that value to those persons holding the synthetic equity. Thus when synthetic equity is granted, it reduces the value of the Western Global shares owned by the ESOP. This either harms the economic interest of ESOP participants or, if the synthetic equity is not properly taken into account in the valuation of Western Global stock, the stock is reported at inflated values.

106.    A rational buyer under no compulsion to purchase Western Global under terms like these (i.e., no right to vote for Board members, who could dilute the value of all Western Global stock by granting themselves synthetic equity) would not have purchased the company stock that the ESOP was forced to purchase, or would have demanded a massive discount in the price of the

stock to account for these defects of ownership, which are not present with other publicly traded air cargo companies.

### E. THE TRUSTEES FAILED TO PROPERLY CONSIDER THE EFFECT OF DEBT INCURRED IN THE ESOP TRANSACTION ON THE COMPANY'S FUTURE FINANCIAL PROSPECTS

107.     Before approving the $1,360 per share price and the other ESOP Transaction terms, the Trustee Defendants also failed to properly consider the substantial debt incurred by Western Global in connection with the ESOP Transaction, the company's ability to service this debt, and the impact debt service would have on Western Global's future value.

108.     As discussed, Western Global took on hundreds of millions of dollars in outside debt to facilitate the ESOP Transaction and pay all or substantially all of the purchase price to the Seller Defendants. By utilizing outside financial institution financing, the Seller Defendants were paid immediately, while the company became responsible for repaying the debt associated with the ESOP Transaction at the extraordinary interest rates demanded by the market given its view of Western Global's true value.

109.     The Department of Labor, as expressed through multiple settlement orders with ESOP trustees that abrogated their fiduciary duties, has stressed the importance of analyzing the impact a loan taken out to finance an ESOP transaction has on the company post-transaction. For example, as part of a required analysis pursuant to a settlement with the DOL, an ESOP sponsor was required to analyze:

- "Whether the ESOP sponsor will be able to service the debt taken on in connection with the transaction (including the ability to service the debt in the event that the ESOP sponsor fails to meet the projections relied upon in valuing the stock); [and] . . . . The financial impact of the transaction on the ESOP sponsor[.]"

Agreement Concerning Fiduciary Engagements and Process Requirements for Employer Stock Transactions at 5, *Perez v. GreatBanc Trust Co.*, 5:12-cv-01648-R-DTB (C.D. Cal. Jun. 2, 2014).[14]

110. The impact on Western Global of the debt incurred to finance the ESOP Transaction is substantial. Western Global operated debt-free prior to the ESOP Transaction. Now, however, the company carries $410 million in debt at an exorbitant 10.375% interest rate. Servicing that debt will require around $40 million annually in interest payments alone. This amount is nearly equal to Western Global's prior five-year EBITDA average of $46 million, and nearly two-thirds of the five-year lease-adjusted EBITDA average of $65 million. In other words, because of the ESOP Transaction, Western Global has been saddled with interest payments that absorb at least two-thirds of the company's average EBITDA and indeed might consume nearly all of that amount.

111. Even if the company is able to make payments on the debt, it will significantly impact Western Global's ability to succeed, or even survive, as a company. Western Global has a very old fleet that will need to be almost entirely replaced over the next decade. Its pilots, mechanics, and loadmasters are paid well below market wages, and the monies the company will need to devote to debt service may make it difficult, if not impossible, to retain a high-quality workforce. And finally, by tying up nearly all of the company's available cash flow, the ESOP

---

[14] Similar provisions regarding the consideration and treatment of corporate debt on proposed ESOP transactions are present in numerous settlement orders involving the Department of Labor. *See, e.g.*, Consent Order and Judgment, Ex. B at 6, *Scalia v. Farmers Nat'l Bank of Danville et al.*, 1:20-cv-00674-JRS-TAB (S.D. Ind. Apr. 3, 2020); Agreed Consent Decree and Order, Ex. D at 10, *Acosta v. Veronica Mueller, et al.*, Civil Action No. 2:13-cv-1302-PP (E.D. Wis. Dec. 27, 2017); Consent Order and Judgment at 15, *Acosta v. First Bankers Tr. Servs., Inc., et al.*, 1:12-cv-08648-GBD (S.D.N.Y. Sept. 21, 2017).

Transaction makes it impossible for the company to make the necessary investments to modernize its safety equipment and properly maintain and repair its aircraft.

112.   In other words, the ESOP Transaction put the company's very survival at risk—and with it, employees' retirement savings—so that the Neffs could cash out to the tune of half a billion dollars (while retaining total control over the company).

113.   As the allegations above demonstrate, together and separately, the ESOP purchased the 37.5% stake in Western Global for greater than fair market value.

**PLAN-WIDE RELIEF**

114.   29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to obtain for the Plan the remedies provided by 29 U.S.C. § 1109(a). Plaintiffs seek recovery on behalf of the Plan pursuant to this statutory provision.

115.   Plaintiffs seek recovery for injuries to the Plan sustained as a result of the prohibited transactions and breaches of fiduciary duties and seek to have Paredes and PFS removed as Trustees and to have the Neffs enjoined from exercising any fiduciary decision-making for the ESOP, such as the power to select and remove the ESOP Trustee. Plaintiffs also seek other relief on behalf of the Plan, such as disgorgement of profits, a declaration that the ESOP Transaction is a non-exempt prohibited transaction, and rescission of the Transaction.

116.   Plaintiffs are adequate to bring this representative action on behalf of the Plan, and their interests are aligned with the Plan's participants and beneficiaries. Plaintiffs do not have any conflicts of interest with any participants or beneficiaries that would impair or impede their ability to pursue this action. Plaintiffs have retained counsel experienced in ERISA litigation, and intend to pursue this action vigorously on behalf of the Plan.

## CLASS ACTION ALLEGATIONS

117.    Plaintiffs additionally and alternatively seek certification of this action as a class action pursuant to Federal Rule of Civil Procedure 23.

118.    Plaintiffs assert their claims on behalf of a class of participants and beneficiaries of the Plan defined as follows:

> All participants and beneficiaries of the Western Global Airlines, Inc. Employee Stock Ownership Plan at any time since its inception, excluding Defendants, their family members or beneficiaries, or any other persons with responsibility for the Plan's investment or administrative functions.

119.    Numerosity: The Class is so numerous that joinder of all Class members is impracticable. The Plan had approximately 350 participants as of the end of 2020.

120.    Typicality:      Plaintiffs' claims are typical of the Class members' claims because they assert the exact same representational claim to remedy the ESOP's injuries that all Plan participants are granted under 29 U.S.C. § 1132(a)(2). Like other Class members, Plaintiffs are Plan participants and suffered the same injuries as a result of Defendants' violations of ERISA. Defendants' actions affected all Plan participants, including Plaintiffs, in the same way because Defendants' actions were taken with respect to the ESOP as a whole. Most importantly, Defendants caused ESOP participants economic harm in the form of overpaying for the Western Global stock.

121.    Adequacy:      Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are aligned with the Class that they seek to represent, and they have retained counsel experienced in complex class action litigation, including ERISA litigation generally and

ESOP litigation in particular. Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

122.  <u>Commonality</u>: Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

    a.  Whether the Trustee Defendants were fiduciaries of the Plan;

    b.  Whether the Neffs acted in a fiduciary capacity in connection with the administration of the Plan, the appointment of the Trustee, the valuation of Western Global shares, the sale of company stock to the ESOP, and the financing of that purchase;

    c.  Whether Defendants caused the Plan to engage in prohibited transactions under ERISA by permitting the Plan to purchase Western Global shares and take loans from parties in interest;

    d.  Whether Defendants caused the Plan to pay more than fair market value for the Western Global shares purchased from Seller Defendants in the ESOP Transaction;

    e.  Whether the Trustee Defendants acted with an eye single to the interests of participants and utilized the necessary skill, diligence, and care in hiring an appraiser, overseeing the appraisal and valuation of the company, and agreeing to purchase company shares on behalf of the Plan on the terms of the ESOP Transaction;

f. Whether the Neffs acted with an eye single to the interests of participants and conducted a thorough and independent investigation in the process of selecting and appointing Paredes as the Trustee for the ESOP;

g. Whether the Neffs were responsible for monitoring the performance of the Trustee Defendants;

h. Whether the Neffs monitored the performance of the Trustee Defendants with an eye single to the interest of participants and with the requisite skill, care, diligence and prudence;

i. Whether the Trustee Defendants engaged in a prohibited transaction by acting on behalf of a party adverse to the ESOP and its participants in the ESOP Transaction;

j. Whether the Trustee Defendants engaged in a prohibited transaction by receiving consideration for their own account in connection with the ESOP Transaction;

k. Whether the Neffs are liable as co-fiduciaries for any prohibited transactions or fiduciary breaches by the Trustee Defendants;

l. Whether the Seller Defendants knowingly participated in a prohibited transaction in connection with the ESOP Transaction;

m. The amount of losses suffered by the ESOP and its participants;

n. The proper form of equitable and injunctive relief; and

o. The proper measure of monetary relief.

123.    Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or

varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

124.    Class certification is also appropriate under Federal Rule of Civil Procedure 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court, such as removal of Plan fiduciaries, rescission or amendment of the ESOP Transaction, or appointment of an independent fiduciary would be dispositive of non-party participants' interests. The accounting and restoration of the property of the Plan that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other Plan participants.

125.    Class certification is also appropriate under Federal Rule of Civil Procedure 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

126.     Plaintiffs and their undersigned counsel will provide notice to the class to the extent required by Federal Rule of Civil Procedure 23(c)(2) and the Court. If the class is certified under Rule 23(b)(1), "the court may direct appropriate notice to the class" but is not required to do so. Fed. R. Civ. P. 23(c)(2)(A). If the class is certified under Federal Rule of Civil Procedure 23(b)(3), "the court must direct to class members the best notice that is practicable under the circumstances," which includes notice by United States mail. Fed. R. Civ. P. 23(c)(2)(B).

## CAUSES OF ACTION

### COUNT I

**CAUSING OR ENGAGING IN PROHIBITED TRANSACTIONS IN VIOLATION OF 29 U.S.C. § 1106(a)–(b)**
(against the Trustee Defendants)

127.     ERISA prohibits a plan fiduciary from causing a plan to engage directly or indirectly in a sale or exchange of any property with a party in interest. The Trustee Defendants caused the Plan to purchase stock from the Seller Defendants.

128.     ERISA prohibits a plan fiduciary from causing the Plan to borrow money from a party in interest. Here, the Trustee Defendants caused the Plan to borrow money from Western Global, the Plan sponsor.

129.     ERISA prohibits a plan fiduciary from causing the Plan to engage in a transaction that constitutes a direct or indirect transfer to, or use by or for the benefit of a party in interest, of any assets of the plan. Here, the Trustee Defendants caused the Plan to indirectly transfer Plan assets to the Seller Defendants, as payment for company shares, and also caused the Plan to directly transfer Plan assets to Western Global, in the form of continuing payments on the company's loan to the Plan as part of the ESOP Transaction.

130.     The stock and loan transactions between the Plan and the parties in interest were authorized by the Trustee Defendants in their capacity as trustees for the Plan.

131.    ERISA mandates that a plan fiduciary shall not "act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants[.]" 29 U.S.C. § 1106(b)(2). The Trustee Defendants caused the Plan to acquire WGA stock from the Seller Defendants for well above fair market value, with the proceeds of loans taken out by Western Global that were used to pay the Seller Defendants. This primarily benefited the Seller Defendants to the substantial detriment of the Plan and its participants.

132.    ERISA provides that a fiduciary may not "receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." 29 U.S.C. § 1106(b)(3). The Trustee Defendants received consideration in the form of fees for their own personal account from Western Global, in connection with the Trustee Defendants acting as trustees in connection with the ESOP transaction, in violation of 29 U.S.C. § 1106(b)(3).

133.    Under 29 U.S.C. § 1109, the Trustee Defendants are liable to make good to the Plan any losses to the Plan resulting from their violations of ERISA, disgorge profits earned from any violations of ERISA, and additionally are subject to other equitable or remedial relief.

134.    ERISA permits a plan participant to bring a suit for relief under 29 U.S.C. § 1109 and to obtain appropriate equitable relief to enforce the provisions of ERISA. 29 U.S.C. § 1132(a)(2) and (a)(3).

135.    The Trustee Defendants caused losses to the Plan resulting from the above-mentioned prohibited transactions, and are liable for those losses, any profits, and additional appropriate equitable relief to be determined by the Court.

## COUNT II

### BREACH OF FIDUCIARY DUTIES OF LOYALTY AND PRUDENCE
### 29 U.S.C. § 1104(A)(1)(A)–(B)
(against the Trustee Defendants and Neffs in their fiduciary capacity)

136.    ERISA requires a plan fiduciary discharge his or her duties with respect to a plan solely in the interest of the participants and beneficiaries, (A) for the exclusive purpose of providing benefits to participants and the beneficiaries of the plan and defraying reasonable expenses of administering the plan, and (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

137.    The fiduciary duty of loyalty is paramount. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

138.    In the context of a transaction involving the assets of the Plan, the duties of loyalty under 29 U.S.C. § 1104(a)(1)(A) and care, skill, prudence and diligence under 29 U.S.C. § 1104(a)(1)(B) require a fiduciary to undertake an appropriate investigation to determine that the plan and its participants receive adequate consideration for the plan's assets and the participants' accounts in the plan.

139.    Pursuant to 29 U.S.C. § 1002(18), adequate consideration for an asset for which there is no generally recognized market means the fair market value of the asset determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with the Department of Labor regulations.

140.    The Trustee Defendants were required to undertake an appropriate and independent investigation of the appraisal and fair market value of WGA stock in 2020 in order to fulfill their fiduciary duties. An appropriate investigation would have revealed that the valuation assigned to

WGA stock in the ESOP Transaction was several times higher than WGA stock's fair market value. The Trustee Defendants also failed to act prudently and exclusively in the best interests of Plan participants, with an eye single toward their best interests, instead attempting to advance their own best interests by demonstrating to the marketplace that they are cooperative trustees, willing to "play ball" with selling owners in order to make sure they get the best possible price for their ownership interest. For these reasons, the Trustee Defendants breached their fiduciary duties.

141.    The Neffs failed to act prudently and exclusively in the best interests of Plan participants in hiring the Trustee Defendants, acting instead at the behest of the Seller Defendants in identifying a trustee who would ensure that the Seller Defendants' company shares were sold to the ESOP at a high price. The Neffs also failed to engage in a prudent, thorough, and independent investigation of potential ESOP trustees in fulfilling their fiduciary duties.

142.    The Neffs acted in a fiduciary capacity in orchestrating the ESOP Transaction and broadly dictating the terms of the transaction, including a price over $500 million and a transfer of 49% or less. The Neffs took steps to finalize this transaction by arranging the issuance of around $400 million of high-interest corporate bonds and a secured loan from Truist Financial to ensure they (through their trusts) were paid up front. The Neffs further exerted influence over the Trustee Defendants to ensure that the transaction was finalized in a manner that best advanced their own interests. These actions were not taken exclusively in the best interests of participants, or with the skill, care, diligence and prudence that a fiduciary acting under similar circumstances would act. For these reasons, the Neffs breached their fiduciary duties.

143.    ERISA provides that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by Title I of ERISA shall be personally liable to make good to the plan any losses to the plan and disgorge

profits resulting from each such breach, and additionally is subject to such other equitable or remedial relief as the court may deem appropriate. 29 U.S.C. § 1109.

144.    29 U.S.C. § 1132(a)(2) and (a)(3) permit a plan participant to bring a suit for relief under 29 U.S.C. § 1109 on behalf of the plan and to obtain appropriate equitable relief to enforce the provisions of Title I of ERISA or to enforce the terms of the plan.

145.    Defendants caused losses to the Plan resulting from the above-mentioned fiduciary breaches, and are liable for those losses and additional appropriate equitable relief to be determined by the Court.

## COUNT III

### FAILURE TO MONITOR FIDUCIARIES
### 29 U.S.C. § 1104(a)(1)(A)–(B)
(against the Neffs in their fiduciary capacity)

146.    The Trustee Defendants and Neffs are liable for losses suffered by the Plan as a result of the above-mentioned breaches of fiduciary duties, any profits gained, and additional appropriate equitable relief to be determined by the Court.

147.    Any fiduciary with the power to appoint and/or remove other fiduciaries has an obligation to monitor the appointed fiduciary to ensure that he/she is acting in compliance with the terms of the Plan and in accordance with ERISA. *See* 29 C.F.R. § 2509.75-8 (FR-17). If the appointed fiduciary has violated or continues to violate ERISA, the monitoring fiduciary must remove the appointed fiduciary and attempt to restore any losses to the plan caused by the ERISA violations.

148.    As described above, as the party responsible for selecting the Trustee Defendants, the Neffs had an obligation to monitor their performance and remove them when they failed to act in accordance with ERISA.

149.    Additionally, pursuant to their authority over the Plan as the sole members of

Western Global's Board, the Neffs had a duty to monitor the performance of the Trustee Defendants, to ensure that they properly administered and managed the Plan, including engaging in a prudent process of selecting and monitoring an appraiser, while acting exclusively in the interests of Plan participants. The Neffs had a responsibility to remove the Trustee Defendants when they failed to execute these duties in accordance with ERISA.

150.    The Neffs stood by, taking no appropriate action, as the Trustee Defendants failed to act in accordance with their fiduciary duties, and caused the Plan to engage in prohibited transactions, as described above.

151.    The Neffs are liable under 29 U.S.C. § 1132(a)(2) and (a)(3) for losses caused by their monitoring failures, any profits gained thereby, and for other appropriate equitable relief to be determined by the Court.

### COUNT IV

**CO-FIDUCIARY LIABILITY**
**29 U.S.C. § 1105(a)**
(against the Neffs in their fiduciary capacity)

152.    ERISA provides that a fiduciary "with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan . . . if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary" or "has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach." 29 U.S.C. § 1105(a).

153.    The Neffs were the highest level of management at Western Global and were involved in the preparation of the financial data and projections underlying the stock appraisal the Trustee Defendants relied upon in selling the company shares to the Plan.

154.    The Neffs were responsible for procuring financing for the ESOP Transaction in the form of high-interest corporate bonds and a secured bank loan, to ensure the Seller Defendants

were paid in full, up front, for the minority ownership stake transferred to the Plan.

155.    Given that the Neffs were responsible for negotiating the terms of the stock transfer, the Neffs had knowledge that the price paid for the company shares did not reflect an adequate discount to reflect their continued control of the company after the transaction.

156.    Given their management of Western Global since its inception, their involvement in other sales of air cargo businesses, and their decades of experience in the aviation business, the Neffs also were aware that the price of company shares was being unduly influenced by a short-term spike in profitability caused in large part by short-term economic factors that were very unlikely to persist, and that the company shares were being sold for several times above their fair market value.

157.    For all these reasons, the Neffs knowingly participated in the ERISA violations, and also had knowledge of the ERISA violations, but took no actions to remedy them. For these reasons, the Neffs are liable as co-fiduciaries under 29 U.S.C. § 1105(a), and are therefore jointly and severally liable for the fiduciary breaches of the Trustee Defendants outlined above.

## COUNT V

### PROHIBITED TRANSACTIONS
### 29 U.S.C. §§ 1106, 1132(a)(2)–(3)
(against the Seller Defendants)

158.    As discussed in Count One, the Trustee Defendants caused the Plan to engage in a prohibited transaction with the Seller Defendants, in violation of 29 U.S.C. § 1106(a).

159.    ERISA prohibits fiduciaries to a plan from engaging in self-dealing transactions with the plan. 29 U.S.C. § 1106(b). Thus, to the extent any Seller Defendant is a fiduciary and exercised their fiduciary power in orchestrating the sale of their shares to the Plan, they engaged in a prohibited transaction under 29 U.S.C. § 1106.

160.    In addition, the Supreme Court has held that anyone, including a non-fiduciary

party-in-interest, who receives the benefit of conduct that violates ERISA may be subject to equitable remedies under 29 U.S.C. § 1132(a)(3) if they have "actual or constructive knowledge of the circumstances that rendered the transaction unlawful." *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 251 (2000).

161.   As described *supra* ¶¶ 52-57, the Seller Defendants were parties-in-interest to the Plan both before and after the ESOP Transaction.

162.   Thus, to the extent any Seller Defendant was not acting as a fiduciary, the Seller Defendants are liable as non-fiduciary parties-in-interest under *Harris Trust*, because each of them knowingly participated in prohibited transactions under ERISA.

163.   As Board members and officers, the Neffs who were trustees acting on behalf of the Seller Defendants were directly involved in and directed the preparation of financial statements as well as financial projections underlying the stock appraisal forming the basis of the ESOP Transaction.

164.   Having closed on both the bond issuance and the secured loan, the Seller Defendants were aware that the broad contours of the ESOP Transaction and purchase price were pre-ordained, before the Trustee Defendants had completed their valuation.

165.   Based on the need to issue the corporate bonds used to finance the transaction at a coupon rate of 10.375%—nearly double the effective yield of the average "junk" bond in the marketplace—the Seller Defendants were aware the marketplace believed Western Global had nearly a 50% likelihood of defaulting on the bonds, and that therefore Western Global was worth substantially less than the $1.36 billion valuation assigned to the company as part of the ESOP Transaction.

166.   As owners of the airplane leasing companies, the Seller Defendants also were aware

that, despite their representation, the Seller Defendants were not in fact transferring all of the planes that they owned to Western Global as part of the ESOP Transaction, and that they had in fact purchased a 747 aircraft in April 2020 that they planned on leasing back to Western Global after the ESOP Transaction had closed.

167.    As directors and executives in Western Global, the Seller Defendants were further aware of the poor condition of Western Global's fleet of aircraft, and that nearly a third of the fleet was generally grounded for maintenance or repairs at any given time, representing significant risk to the company, and also demonstrating that the value of the aircraft assets transferred to Western Global as part of the ESOP Transaction was less than what was represented to the Trustee Defendants.

168.    The Seller Defendants knew that the profit projections relied upon by the Trustee Defendants failed to take into account the cyclical nature of the profitability of air cargo transportation, and the fact that revenue per ton and load factor were near multi-decade highs in the recent quarters that the Trustee Defendants relied upon for purposes of valuing the company.

169.    The Neffs acting as the trustees of Seller Defendants actively participated in the ESOP Transaction by authorizing and signing the Stock Purchase Agreement, the ESOP Loan and Pledge Agreement and other Transaction documents.

170.    Thus, based on their knowledge of the fiduciary status of the parties to the ESOP Transaction, and their knowledge of the circumstances that rendered the ESOP Transaction illegal under ERISA, the Seller Defendants are liable under 29 U.S.C. § 1132(a)(3) as nonfiduciary parties-in-interest.

**COUNT VI**

**VIOLATION OF ERISA'S ANTI-EXCULPATORY RULES**
**29 U.S.C. §§ 1110 and 1104(a)(1)(A), (B)**
(against the Neffs and Trustee Defendants)

171.    29 U.S.C. § 1110(a) provides in relevant part (with exceptions not applicable here) that "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under this part [Part IV of Subtitle B of Title I of ERISA] shall be void as against public policy." As 29 U.S.C. §§ 1104 and 1106 are under Part IV, any provision that attempts to relieve the Trustee or another Plan fiduciary of responsibility or liability is void pursuant to 29 U.S.C. § 1110(a) unless there is an exception or exemption. No such exception or exemption is applicable here.

172.    An indemnification agreement between Western Global and the Trustee Defendants purports to provide payment or reimbursement for the benefit of the Trustee for any and all loss or liability, including but not limited to attorneys' fees.

173.    Relatedly, WGA Holdings, Inc.'s Articles of Incorporation broadly indemnifies the company's board, officers, and agents against all liability and loss suffered and expenses (including attorneys' fees) reasonably incurred by the indemnified people in any action, suit or proceeding relating to the company.

174.    Finally, the ESOP Plan Document provides that the company's board shall be indemnified and held harmless by the company from any expense or liability hereunder unless due to or arising from fraud, dishonesty, gross negligence, or misconduct of the board.

175.    To the extent that the indemnification agreement, ESOP Plan Document, and Articles of Incorporation attempt to relieve the Neffs or Trustee Defendants of their responsibility or liability to discharge their duties under ERISA, or attempts to have Western Global (a Plan-owned company) and thereby the Plan be responsible for the Defendants' liability for breaches of

46

the statute, including but not limited to defense costs, such provisions are void as against public policy.

176.    To the extent that any of the fiduciaries of the Plan would agree to the exercise of such a provision that is void against public policy under 29 U.S.C. § 1110, they breached their fiduciary duties under ERISA.

177.    Plaintiffs seek relief under 29 U.S.C. § 1132(a)(2) and (a)(3).

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for judgment against Defendants and for the following relief:

A.    Declare that the Defendants caused the Plan to engage in and themselves engaged in non-exempt prohibited transactions, including the ESOP Transaction and all loans undertaken to complete the ESOP Transaction;

B.    Declare that the Trustee Defendants and the Neffs breached their fiduciary duties under ERISA to the Plan and its participants;

C.    Declare that the Neffs knowingly participated and enabled the non-exempt prohibited transaction (i.e., the ESOP Transaction) and thus are liable as co-fiduciaries for the Trustee Defendants' prohibited transactions and fiduciary breaches;

D.    Declare that the indemnification agreement, ESOP Plan Document, and Articles of Incorporation are void as against public policy to the extent they attempt to relieve the Neffs or Trustee Defendants of their responsibility or liability to discharge their duties under ERISA;

E.    Declare that the Seller Defendants knowingly participated in prohibited transactions in violation of ERISA;

F.    Order Defendants jointly and severally to make good to the Plan and/or any successor trust(s) the losses resulting from the violations of ERISA and to disgorge any profits they made through the use of Plan assets;

G.    Order rescission of the ESOP Transaction;

H.    Impose a constructive trust on all payments received by the Seller Defendants as a result of the ESOP Transaction;

I.    Order that Defendants provide other appropriate equitable relief to the Plan and its participants and beneficiaries, including but not limited to surcharge, providing an accounting for profits, disgorgement of profits (including any interest or investment returns), and imposing a constructive trust and/or equitable lien on any funds wrongfully held by Defendants;

J.      Order the removal of the Trustee Defendants as trustees of the Plan, to be replaced by an Independent Fiduciary;

K.      Order the Neffs to contact the IRS concerning the taxes they owe due to the declaration that the ESOP Transaction constituted a non-exempt prohibited transaction, which is taxable on all disqualified persons, such as the Neffs, pursuant to 26 U.S.C. § 4975(a) and (b) ("Tax on Prohibited Transactions").

L.      Enjoin the Neffs from serving the Plan in any fiduciary capacity including but not limited to an injunction precluding them from serving as, appointing, and/or removing the Trustee or members of any committee acting as a Plan fiduciary and precluding them from any involvement in the valuation of Western Global stock;

M.      Enjoin Defendants from further violations of their fiduciary responsibilities, obligations, and/or other duties;

N.      Enjoin Defendants from invoking or enforcing the indemnification agreement, ESOP Plan Document, and Articles of Incorporation to the extent they attempt to relieve the Neffs or Trustee Defendants of their responsibility or liability to discharge their duties under ERISA;

O.      Enjoin all Defendants, including the Seller Defendants, from dissipating any of the proceeds from the ESOP Transaction held in their actual or constructive possession;

P.      Enjoin Defendants from transferring or disposing of any proceeds from the ESOP Transaction to any person or entity which would prejudice, frustrate, or otherwise impair the ability to recover the same;

Q.      Order the proceeds of any recovery for the Plan to be allocated to the accounts of the class members to make them whole for any injury that they suffered as a result of the breaches of ERISA declared by the Court;

R.      Order the allocation to the accounts of class members additional shares of stock that would have been allocated to their accounts but for the Plan's overpayment for Western Global stock and Defendants' fiduciary breaches;

S.      Award Plaintiffs reasonable attorneys' fees and costs of suit incurred herein pursuant to 29 U.S.C. § 1132(g), and/or for the benefit obtained for the common fund;

T.      Prejudgment and post-judgment interest;

U.      Certify Plaintiffs' authority to seek plan-wide relief on behalf of the Plan pursuant to 29 U.S.C. § 1132(a)(2);

V.      Alternatively, certify this action as a class action pursuant to Federal Rule of Civil Procedure 23, certify the named Plaintiffs as class representatives, and their counsel as class counsel; and

W.    Award such other and further relief as the Court deems just and equitable.

October 20, 2023                    **COOCH AND TAYLOR, P.A.**

                                        /s/ *Carmella P. Keener*
                                   Carmella P. Keener (Del. No. 2810)
                                   1000 N. West St., Suite 1500
                                   P.O. Box 1680
                                   Wilmington, DE 19899-1680
                                   (302) 984-3816
                                   ckeener@coochtaylor.com

                                   *Attorneys for Plaintiffs*

                                   **OF COUNSEL:**

                                   **STRIS & MAHER LLP**
                                   Peter K. Stris (admitted *pro hac vice*)
                                   Rachana A. Pathak (admitted *pro hac vice*)
                                   John Stokes (admitted *pro hac vice*)
                                   Victor O'Connell (admitted *pro hac vice*)
                                   777 S. Figueroa St., Suite 3850
                                   Los Angeles, CA 90017
                                   (213) 995-6800
                                   pstris@stris.com
                                   rpathak@stris.com
                                   jstokes@stris.com
                                   voconnell@stris.com

                                   **COHEN MILSTEIN SELLERS & TOLL PLLC**
                                   Michelle C. Yau (admitted *pro hac vice*)
                                   Daniel R. Sutter (admitted *pro hac vice*)
                                   1100 New York Ave. NW ● Fifth Floor
                                   Washington, DC 20005
                                   (202) 408-4600
                                   myau@cohenmilstein.com
                                   dsutter@cohenmilstein.com

                                   Eleanor Frisch (admitted *pro hac vice*)
                                   400 South 4th Street # 401-29
                                   Minneapolis, MN 55415
                                   (612) 807-1575
                                   efrisch@cohenmilstein.com

**NICHOLS KASTER, PLLP**
Paul J. Lukas (admitted *pro hac vice*)
Brock J. Specht (admitted *pro hac vice*)
4600 IDS Center, 80 S 8th Street
Minneapolis, MN 55402
Telephone: 612-256-3200
lukas@nka.com
bspecht@nka.com